First case for argument this morning is 24-1167 Fisher v. United States. Mr. Vowley? Yes, Your Honor. May I? Please proceed. Yes. Good morning, Your Honors. My name is Patrick Vowley. I represent the appellants in this case. May it please the Court. This Court's decision in Fairholme does not control the outcome of this appeal for two reasons. First, the plaintiffs in Fairholme were not adequate representatives of the company because they made a strategic decision on appeal to abandon their derivative takings claims and instead advocate principally for their direct claims, which were more valuable to them. Given this history, such a history does not give rise to claim preclusion. It instead reflects a failure of the adversarial system where you have a party in interest, the companies here, that were not adequately represented by the shareholders that purported to represent them. And you were amici in the Fairholme case, correct? That's correct. We did seek to participate in the appeal. That request was denied, and we were permitted to submit amicus briefs. But just to be clear, as I understand it, the government hasn't contended because it's not the case that participation as an amicus supports claim preclusion or any kind of preclusion. In fact, the law is to the contrary on that point. So what's the standard? The standard for claim preclusion? Yeah. It's an inadequate representation. Is it not that it is so grossly deficient as to be apparent to the opposing party? That's partly correct. I think the grossly deficient standard deals with a situation where a party or its counsel inadequately conduct the litigation in some way. I think here what we're dealing with is a situation that's beyond that. Our argument is not simply that they did a poor job arguing the appeal. Our argument is that they made a strategic decision having both direct and derivative claims among their plaintiffs to advocate for the direct claims to the exclusion of the derivative claims. And it's important in pointing out that distinction that those claims were mutually exclusive. Both the direct and derivative plaintiffs on that appeal sought compensation from essentially the pot of money, if you will. The direct plaintiffs wanted it to be paid directly to them. The derivative plaintiffs asked for that same money to be restored to the enterprises. In that respect, the fair home plaintiff's abandonment of the derivative claims on appeal, fundamentally, if adequate representation is to mean anything, a party that abandons a claim and advocates for a completely contradictory competing claim cannot be an adequate representative. You've now said three times by my count that they had abandoned the derivative claim. I didn't see that. Do you simply mean, is that your inference from the fact that they didn't expressly brief it, that they, quote, abandoned it? Well, I think if you look at their briefing and their opening brief, pages 30 through 60 of their opening brief, they spend 30 pages detailing with citation to dozens of authorities the basis for their assertion that the shareholders had a direct property interest that supported a viable takings claim. They repeated similar arguments in their reply brief, a 25-page span of their reply brief, again, advocating in detail why their direct claims stated a property interest that could be subject to a taking. They spent zero pages and cited zero authorities in any of their briefing describing or advocating for the merits of the derivative takings claim, explaining the property interest that could be taken. So I think I'm right. Your contention is that they effectively abandoned by not devoting any of their pages of their briefing to the derivative claim. But you can't point to anywhere where they said, the Federal Circuit, we're no longer oppressing our derivative claim. Please don't address it. We're dropping it. There was no express waiver. But beyond the lack of briefing, I think the assertion of the contrary position that these claims were direct claims, it also supports the inference of an those direct claims were fundamentally incompatible with the derivative claims. So by advancing the direct claims and arguing at length for those, that they're essentially arguing against their derivative claims. But the legal standard here requires that there be a gross deficiency of representation. Sounds to me that more like what you're arguing is that representation was not zealous enough. I respectfully disagree with that description. I think the gross deficiency standard deals with where essentially the attorneys do a poor job. I think there's other strands of this. You are arguing gross deficiency. I think I'm arguing it in the alternative, but it's not my principal argument. My principal argument is that the Fairholme plaintiffs were conflicted and that conflict manifested itself in their failure to litigate the merits of the derivative takings claim. And I think that goes you have to show that that conflict had some sort of prejudice. And that's where you get into the gross misrepresentation claim. I respectfully disagree with that. I think the First Circuit's decision and Ray Sonis, which both parties cite, that develops the standard essentially creates two different branches. There's one where there's a and the gross deficiency standard deals with essentially the quality of argumentation. I think a conflict, particularly a manifested conflict, that impacts the parties of representation and articulation of the claim is a different prong and perhaps a simpler prong. I think or if you want to merge the two together, you could say that it is per se grossly deficient to openly advocate against the claim you're purporting to assert. Well, would a cert petition on an abandoned claim be frivolous? This was in the cert petition, correct? Filed by the government points out. That's correct. After they lost the appeal in this court, they did attempt a cert petition in which they, for the first time on appeal, started advocating for the merits of the takings claim. But that subsequent action doesn't cure any deficiency. Well, doesn't it kind of establish that it wasn't an abandoned claim? I don't think it touches upon the issue of whether the claim was functionally abandoned in this court. I think maybe that later they decided to renew it and attempted again, given that that was their only option at that point. Okay, your second issue. If you don't mind, what's your best case on how we could find that this is inadequate representation sufficient to relieve a party of the effects of race judicata? Because I'm not sure I saw any case like this. It's a narrow exception and I just didn't see any like this. I think that the Enri Sonis case does a good job of setting out the standard. I think the Supreme Court's decision in Taylor v. Sturgill, which I think draws upon merits Sonis, is important too. You might recall that's the case where the Supreme Court rejected the notion of virtual representation as a theory for rest judicata applying to a different plaintiff in a subsequent case. The court there really underscored that this adequate representation issue is not just a jurisprudential rule. It's required by due process. Just to be clear, you're not a different plaintiff, right? Because it's a derivative claim, this claim is always brought on behalf of the enterprises. It was in Fairholme. It is now here. I respectfully disagree with that because before you can reach the conclusion that we're the same party, the adequacy of representation prong comes first. That's a threshold inquiry before you can characterize a subsequent derivative plaintiff as the same plaintiff. What Taylor v. Sturgill makes clear is that adequacy of representation is a requirement of due process because the default as required by due process is that every litigant has its day in court. The application of preclusion principles to a subsequent plaintiff requires as a matter of due process that that party's interest or the party that they seek to represent in this case was adequately represented in the prior litigation. Your second argument on claim preclusion is change of law? Yes, Your Honor. I'd like to deal with that. So I recognize that claim preclusion and issue preclusion that courts as a practical matter have applied the change in law exception a bit differently between those two doctrines. But I think the same doctrine ultimately that's driven by due process applies in both cases. Isn't it a rare exception at best? I do agree it's a rare exception. And the government itself admits it's pointing to this court's decision in the Roche Palo Alto case that even as to claim preclusion where there's a change in an important constitutional right that that potential change supports an exception to claim preclusion. You're right, important fundamental constitutional rights. So there's an example of the Brown versus Board of Education. There's another Voting Rights Act, I think, or something. But there's not much more than that in the jurisprudence, right? Well, correct. There aren't many decisions in which that exception has been applied. But I would respectfully submit, although the takings clause may not garner the same popular interest as other constitutional provisions, it's equally important and it's a fundamental restraint on government powers. I respectfully submit that the Supreme Court's decision in Tyler meets that standard. But to be clear, the court need not even reach that change in law issue if it finds that the Fairholme plaintiffs did not adequately represent the enterprises. I'd like to briefly turn to the merits in particular of the import of Tyler. If no preclusion applies, the court must follow Tyler. Tyler announced a rule that as part of the threshold inquiry of a takings analysis and defining property interests that are potentially subject to a takings requiring just compensation, courts may not rely exclusively on the statutory scheme that is said to authorize the taking to define those property interests and find that no property interest exists. On this point of law, the Eighth Circuit in Tyler and this court in Fairholme, respectfully, made the exact same error by relying exclusively on the statute that's said to authorize the taking to define property interest and to ultimately conclude that no property rights exist. The Supreme Court makes clear in Tyler that you can't simply look at to the statute authorizing... Fairholme, didn't we also, in fairness, rely on the history of heavily regulated institutions like the enterprises that they were always subject to something like a conservatorship? Yes, but I think even if you recognize that a company is subject to a potential conservatorship, the actions that the conservator here took were entirely unprecedented. This is the first time in history where... Well, first, taking a step back, the Supreme Court in Collins recognized that the conservatorship regime under HERA is fundamentally different than prior conservatorship regimes. The Supreme Court described the distinctive feature of the conservatorship as this new authorization to potentially act in the public interest, which may mean also against the company's interest. And the case called out the fact that the enterprise agreed to the conservatorship, right? It agreed to conservatorship, but there's no evidence in the record, and I'm fairly confident that no evidence exists, that at the time the enterprises agreed to the conservatorship, there was no anticipation or foreseeability that the conservatorship would be used in the way it ultimately was. Why does that matter? I'm sorry? Why does that matter, that there be foreseeability? I would submit it's the case that whenever there's an executive actor that has broad discretion to act, the executive actor's actions are always subject to constitutional constraints. The Supreme Court recognized this in Loretto, where it made clear that even where the conduct there, which was an ordinance exercise of the police power permitting cable companies to run cable lines on rental properties, the Supreme Court said that even if we take as a given that that's within the broad police powers of the government, it's a separate question whether the exercise of that power implicates the takings clause. Are we to make anything of the fact that Tyler and Fairholme were kind of before the Supreme Court simultaneously, really close in time at least, within like a week, I think, if I'm right? I don't think so. I'm not sure. I don't think we can draw inferences from the Supreme Court's denial of cert in Tyler. Or excuse me, denial of cert in this case. It ran to Tyler and then within a week of time, it denied cert on Fairholme, right? Yes, but I don't think you can infer from a denial of cert any kind of endorsement of the decision. Obviously, the Supreme Court, especially nowadays, takes a very limited volume of cases. Well, it's not just the endorsement of the decision. You're saying how closely they were tied and that Tyler compels a different result here. That's the basis upon which one would have assumed maybe the Supreme Court, if granting cert on one, would at least help the other. I respectfully disagree. I'm not sure. I can't speak to the court's internal reasoning for why it denies or accepts cert. But I would submit that the core holding of Tyler is fundamentally incompatible with this court's decision in Fairholme. Okay, thank you. And I'd like to, if I could reserve the rest of my time for a moment, I'd appreciate it. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Jerry Sinsnak, appearing on behalf of the United States. This Court can affirm on either of two grounds. It can certainly take the route the Court of Federal Claims took and simply affirm on the grounds that Fairholme Fund's controlling and precedent and hasn't been overruled expressly by this Court or by the Supreme Court. It could also rule in the alternative that plaintiffs are claim precluded from raising this identical derivative takings claim that was raised by plaintiffs in Fairholme. I'll just jump in, since there was questioning about the adequacy of representation. And I think the clearest evidence of why the representation was adequate here is plaintiffs themselves, as Your Honors mentioned, filed an amicus brief in that case. Yeah, but if an issue has been abandoned and blew, they can't resurrect it as amicus. Well, my point, Your Honor, I was going to make is they made the exact same arguments that the plaintiff Barrett in Fairholme made about the derivative claims. There was not an abandonment. There were arguments about the derivative claims. We cite the briefing. It was clear as day that there were arguments about the derivative claims brought by Barrett. And plaintiffs filed an amicus brief in support of Barrett and made all the same arguments. They didn't make the arguments here today that they're criticizing Barrett for not making. So I think that is perhaps the best evidence that what Barrett did there was perfectly adequate. And then, of course, as Your Honor mentioned, he sought cert once the Fairholme Fund's decision came out on these very same issues. So I think that satisfies that point in terms of whether Tyler overruled it. As we mentioned, in claim preclusion, which differs from issue preclusion, there is no change of law exception except perhaps in this momentous change, like Brown v. Board of Education or something along those lines. But Tyler, of course, was not a momentous change in the law. It wasn't a change in the law at all. Do you agree with your colleague on the other side that Tyler's a bad law? No, not at all, Your Honor. I think Tyler... Well, I guess maybe I should take a step back. Tyler is good law in terms of Supreme Court law. I don't think it had any bearing on this Court's decision in Fairholme Funds. This Court applied the same mode of analysis to review the relevant statutes. It revealed the relevant precedent. It revealed the relevant history. It made, I think, a quite straightforward determination that an enterprise that voluntarily agrees to a conservatorship or even is subject to a potential conservatorship, it doesn't have the same property interests. It agreed to the transfer of the enterprise's right to control its assets to the conservator. The conservator then... It did so on the understanding that the conservator had the ability to act in the enterprise's own best interests or the interests of the public and the agency. And one point I want to just make, a minor point. HERA itself was modeled after previous statutes, FERREA, for one. And FERREA itself also contains the same provision allowing the FDIC to act in the best interests of the FDIC, i.e., the public. So when the Supreme Court, I think, was referring to this being an unusual conservatorship, it meant it, you know, compared to the typical conservatorship where, you know, the Britney Spears conservatorship where the conservator is acting on behalf at all times of the person in the conservatorship. You know, but in the financial world, in the world of financial institutions and conservatorships and receiverships, there are, you know, it's different, but it's consistent across, you know, the law and the history of the law. Are there not portions of our fair home opinion that could be read as suggesting we were saying that only in or around 2008 with the passage of HERA did the enterprises lose what may have been a property right previously to prevent the conservatorship? I mean, I think, Your Honor, this is perhaps an easier case than one in which they were, you know, just under the threat of conservatorship. Here they actually voluntarily agreed to the conservatorship, as the court fair home mentioned. So I think that takes it even a step further. And plaintiffs here are challenging the imposition of the conservatorship. They're not challenging HERA itself. So here we have a situation where the enterprises who they're representing voluntarily agreed to the conservatorship. They do so on the understanding that their interest will be transferred to FHFA. Or their control over their assets will be transferred to FHFA, and FHFA will have the right to act in their own interest. So... Okay, and I probably wasn't clear. I think my question goes to post-Tyler. The question of whether or not fair homes analysis is the same mode of analysis that the Supreme Court told us now in Tyler we need to undertake, right? I think there's an argument that fair home is not consistent with the way Tyler now tells us to do things. Aren't there indications in fair home that perhaps we didn't adequately anticipate the Tyler mode of analysis because we suggest at least that maybe the enterprises had a property right prior to Congress enacting HERA, and it's only the congressional action that took away that property right. And if that's what we meant, that wouldn't survive Tyler, would it? I don't think that's correct, Your Honor, because I think what Tyler is fundamentally about, and this was nothing new, is you look at the rules and understandings that govern the particular context in which you're operating in. And here, the particular context, and this court did that in fair home. It looked at the... Of course, you have to start with the relevant statute that governs that context, and here we have HERA. But then it also looked at this court's precedent in Golden Pacific. And again, the statutes there were identical in relevant respects to HERA. It looked at... And this goes back to 1947 when in Fahey, the Supreme Court noted that banking is one of the most highly regulated and closely scrutinized and long-regulated industries. So I think that kind of analysis which informed this court's view in fair home is exactly the type of analysis that Tyler requires this court to look at. And these enterprises were operating under HERA, and again, plaintiffs don't contest that HERA. And nothing could be more straightforward than Tyler, what went down there. Yeah, exactly. Government taking the remainder of what she... The proceeds for the sale. Yeah, and it was an unusual statute. It was a minority rule. And here, I don't think plaintiffs point to a single case in which there's a financial institution involved or a financial institution, certainly not one in conservatorship, to explain how... This is how it's worked for all of recent history going back to the 30s and so forth. And of course, Your Honors, I think it's important to take the context in which this all arose. In 2008, these enterprises received... Underwent catastrophic losses. They were on the brink of failure. It was Treasury's $450 billion commitment of funds that was necessary to bail them out. Private investors weren't willing to provide the funds they needed. So the conservatorship was imposed in light of that kind of dire straits. And it's that Treasury's $450 billion capital commitment that prevented their insolvency then. It continues to prevent their insolvency. And it was the Third Amendment was designed to keep them functioning, as the Supreme Court explained in Collins, and to make sure that capital commitment wasn't drawn down prematurely. Can I take you back to Estoppel just for a moment? Is there, in fact, a conflict, or was there a conflict between the derivative claim and the direct claim? Is that how we should understand what was going on with Mr. Barrett? Not at all, Your Honor. I mean, I think it's quite common, first of all, in shareholder suits to bring both direct and derivative claims. And I point out in the briefing... Well, first of all, as the Court pointed out in footnote 14 of the Fairholme Fund's opinion, the actual property interest analysis is identical between the two. And the Court would have actually dismissed the direct takings claims on the same ground that it dismissed the derivative takings claim if it had reached that question. It didn't reach that question because it dismissed the direct claims on other grounds. But the legal theory as to the property interest is the same. The remedy might be different. It might flow to the shareholders if it's a direct claim. It might flow to the corporation. But the actual legal theory and analysis overlapped. But again, even if they didn't overlap, it's not uncommon at all to be arguing both direct and derivative. And here we have Barrett was clearly arguing, and we cite the portions of the brief filed by Fairholme in which Barrett represented that claim and made all relevant arguments, the same arguments that plaintiffs made in their amicus brief. And have you cited any cases that do give weight to an amicus brief in assessing adequacy of representation for estoppel purposes? Well, I don't have a case, Your Honor. I mean, I think it's, my point being only that plaintiffs, it's kind of rich for plaintiffs to be criticizing the adequacy of representation when they filed the brief making the exact same arguments and not making the arguments they're criticizing. Just taking us back to where we were on HERA, were the enterprises potentially subject to conservatorship even before HERA? In a way, simply financial institutions like in California housing and in Golden Pacific? I'm not sure, Your Honor. They were subject to HUD's oversight at the time. And I would have to check to see exactly whether that included a right to provide. I'm not sure about that. But certainly, obviously, many financial institutions are. So what makes the date, the 2008 date so important here? Well, that was in the midst of the housing and financial crisis that was taking place. I think at that point, it's long ago now, but the housing market was collapsing and these enterprises were hemorrhaging money. They, as I mentioned, they lost more in that year than they had made in the previous 37 years combined. And so they were facing potential insolvency. And that was what led to the enactment of HERA. And that was what led eventually to the conservatorship a couple months later. Does any of the history, pre-2008 history, carry any weight any longer? Or are all these cases supposed to start right at 2008? No, I think, I mean, again, HERA was modeled after FERREA and the FDIC's laws, which ultimately date back to the 30s. I think FERREA was from the late 80s. But these types of conservatorships of financial institutions that were at issue in Golden Pacific and after which HERA was modeled date back much longer than the 2008 decision. Your Honor, is there no further questions? I do, thank you. Okay, we'll restore two minutes of rebuttal. Your Honors, I'd like to first respond to the point about the consent to conservatorship. I think it's important to underscore here the truly unprecedented nature of how the conservatorship powers were used in this case. This was the first time that we're aware of in the history of this country that conservatorship powers were used on a solvent, profitable company to take the assets of that company to support the general fund. Even the case law that talks about broad conservatorship powers in the context of a takings claim recognizes that conservatorships don't completely eliminate property interests. They may constrain them, they may limit them, but they don't eliminate them. And if any remnant of property interest remains, which the law is clear that it does, it must protect against the use of conservatorship powers to take assets from a profitable solvent company. And that's what makes this case fundamentally different and it's frankly why HERA and even the consent to conservatorship can't be seen as a consent to four years later the exercise of conservatorship powers to seize the assets of these companies in the way that they did. Focusing on the adequacy of representation issue, I do think there's a... I know the government has pointed in their briefs and referred again at argument to arguments the plaintiffs made. The only arguments they made were on the succession clause, the HERA succession clause. Nowhere in their briefs do they articulate any property interest that's held by the enterprises that could be subject to a takings clause claim. And critically, that's fundamentally the issue that this court ruled upon in its decision in Faribault. So the precise issue, this threshold issue of defining property interest, that was the basis for this court's decision is precisely the point that they decided not to argue and instead to argue the completely contradictory and opposite claims that those funds should be returned to shareholders and not to the enterprises. I'm happy to respond to any questions. No, thank you very much. Thank you. Thank both sides and the case is submitted.